IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

TIRANJA SMITH,                         *
                                       *
        Plaintiff,                     *
                                       *
vs.                                    *    Civil Action No. 06-00818-B
                                       *
MICHAEL J. ASTRUE,                     *
Commissioner of                        *
Social Security,                       *
                                       *
        Defendant.                     *

                                **ORDER**

        Plaintiff Tiranja Smith ("Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for supplemental security income benefits under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381 et seq. On August 1, 2007, the parties consented to have the undersigned conduct any and all proceedings in this case. (Doc. 19).  Thus, this case was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73.  (Doc. 20). Oral argument was held on October 4, 2007.  Upon careful consideration of the administrative record, oral argument,  and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED.**

                                  1

I.   **Procedural History**

Plaintiff filed an application for supplemental security income benefits on July 7, 2003. In the application, Plaintiff alleged that she had been disabled since June 1, 1995. Plaintiff's application was denied on August 12, 2003. She did not appeal the denial. Plaintiff protectively filed a second application for supplemental security income benefits on February 13, 2004. This time, she alleged disability beginning on December 1, 2003 due to asthma. (Tr. 64, 65-66, 117). Plaintiff's second application was denied on April 7, 2004. (Tr. 24-25). Plaintiff filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 38). The administrative hearing, held on August 2, 2005, was recessed to afford Plaintiff an opportunity to secure counsel. (Tr. 391-399). On January 26, 2006, a second administrative hearing was held before ALJ Ben E. Sheely ("ALJ Sheely"). The hearing was attended by Plaintiff, her representative, and a vocational expert. (Tr. 365-390). On June 29, 2006, ALJ Sheely issued an unfavorable decision. (Tr. 9-21A). Plaintiff appealed the decision, and on November 7, 2006 the Appeals Council ("AC") denied Plaintiff's request for review. (Tr. 5-7). Thus, the ALJ's decision became final (Tr. 5-7). The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. § 405(g).

2

II.   **Issues on Appeal**

A.   Whether the ALJ erred in failing to consider the severity of the Plaintiff's non-exertional impairment in finding that she could perform her past relevant work as a cashier and in failing to give appropriate consideration to the medical source statement of the treating physician as required under SSR 96-2P, SSR 96-5P, and SSR 96-7P.

B.   Whether the ALJ erred by not accepting vocational testimony which supports a finding that Plaintiff cannot perform any work in significant numbers in the national economy.

III. **Background Facts**

Plaintiff was born on July 22, 1960, and was 45 years old at the time of the administrative hearing. (Tr. 24, 65, 370). She has a 9th grade education and past relevant work ("PRW") as a cashier, childcare worker, cook, nurse aid, and school cafeteria worker. (Tr. 82-83, 86, 118, 123, 129-138, 156-164, 170-171, 393-394, 370-371). Plaintiff testified that she last worked in 2003 for a month as a cashier at a service station. Plaintiff described her duties as working the cash register, stocking and cleaning up. According to Plaintiff, she left that job because she was not knowledgeable about the computer and the machinery for the gas pumps, her lifting was limited, and she was unable to dust or sweep. (Tr. 370-371).

At the administrative hearing, asthma was identified as Plaintiff's main impairment; however, it was also reported that

Plaintiff has gastroesophagael reflux disease ("GERD"), which interferes with her ability to take certain medication.[1] (Tr. 368-369). Plaintiff reported that she is able to care for her personal needs, that she can perform light chores, such as making her bed, and that she is able to drive a car[2]. Plaintiff also indicated that she lives with her sister, and that her family assists her with her bills. (Tr. 373).

According to Plaintiff, she gets tired very quickly, has shortness of breath, and sometimes has to use her Albuteral inhaler four or five times a day. (Tr. 144). Plaintiff also testified that she can lift about 15 pounds, sit one to two hours in an eight-hour workday, and that her walking is very limited. (Tr. 372). Plaintiff further testified that when she is not engaged in activity, she uses her nebulizer machine every other day, two or three times a day, usually for periods of 35 or 40 minutes, and that her condition worsens when she does activities such as making

---

[1]According to Plaintiff, her GERD triggers her asthma, and using the inhaler more than four times a day triggers her GERD. (Tr. 377-378)

[2]In a Physical Activities Questionnaires dated March 24, 2004, Plaintiff states that she has difficulty doing her daily chores because she gets over-heated and becomes short of breath. Plaintiff indicates that she has difficulty doing her hair because her arms get so tired, that her family helps her cook because she gets too hot, helps her shop because she cannot do much walking and lifting, and helps her make her bed and vacuum because these chores are too hard for her and the dust from the vacuum triggers her asthma. She also states that she is unable to work in the yard, and cannot be outside if someone is cutting the grass. (Tr. 144-155).

the bed, doing laundry, and walking. She indicated that she has to rest between tasks.   She further testified that her medications cause her to have a dry mouth, and to be fatigued, short of breath, irritable, and forgetful.  (Tr. 375-377). Plaintiff reports that her medications include Singulair, Advair, Albuterol, Nasacort, Bidex, and Allegra (Tr. 168), and medical records from Victory lists her medications as Aerobid, Floxin, Flagyl, Albuterol, Serevent, Advair, Ceftin, Medent, Singular, Xepenex, Prednisone, Flovent, Flonaze, Hycodan and Nasacort (Tr. 174-175).

IV.  **Analysis**

A.  **Standard of Review**

In reviewing claims brought under the Act, this Court's role is a limited one.  This Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence, and 2) whether the correct legal standards were applied. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).[3]  A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth

---

[3]This Court's review of the Commissioner's application of legal principles is plenary.  Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (finding that
substantial evidence is defined as "more than a scintilla but less
than a preponderance," and consists of "such relevant evidence as
a reasonable person would accept as adequate to support a
conclusion[]").   In determining whether substantial evidence
exists, a court must view the record as a whole, taking into
account evidence favorable as well as unfavorable to the
Commissioner's decision.  Chester v. Bowen, 792 F.2d 129, 131 (11th
Cir. 1986); Short v. Apfel, 1999 U.S. DIST. LEXIS 10163 (S.D. Ala.
1999).

   **B.   Discussion**

   An individual who applies for Social Security disability
benefits must prove her disability.   20 C.F.R. §§ 404.1512,
416.912.   Disability is defined as the "inability to do any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for
a continuous period of not less than twelve months."  42 U.S.C. §
423(d)(1)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a).   The Social
Security regulations provide a five-step sequential evaluation
process for determining if a claimant has proven her disability.
20 C.F.R. §§ 404.1520, 416.920.<sup>4</sup>   See, e.g., Crayton v. Callahan,

_____

     <sup>4</sup>The claimant must first prove that he or she has not
engaged in substantial gainful activity.   The second step

120 F.3d 1217, 1219 (11th Cir. 1997).

In the case <u>sub judice</u>, the ALJ determined that Plaintiff had not engaged in substantial gainful activity and has the severe impairment of asthma. (Tr. 14, 15). The ALJ found that Plaintiff does not have an impairment listed in or medically equal to one in the Listings. (Tr. 15). The ALJ also determined that Plaintiff retains the Residual Functional Capacity (hereinafter "RFC") to perform light work. (Tr. 16, 20). Specifically, the ALJ found that Plaintiff can sit/stand/walk six hours each during an eight-hour

---

requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience. If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove inability to perform their past relevant work. <u>Jones v. Bowen</u>, 810 F.2d 1001, 1005 (11th Cir. 1986).

In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; (4) the claimant's age, education and work history. <u>Id</u>. at 1005. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history. <u>Sryock v. Heckler</u>, 764 F.2d 834 (11th Cir. 1985). If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. <u>Jones v. Apfel</u>, 190 F.3d 1224, 1228 (11th Cir. 1999). <u>See also</u> <u>Hale v. Bowen</u>, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing <u>Francis v. Heckler</u>, 749 F.2d 1562, 1564 (11th Cir. 1985)).

workday; frequently lift/carry 10 pounds; occasionally lift/carry 20 pounds; use her arms and legs for pushing/pulling of controls; and occasionally climb and reach overhead. He further found that Plaintiff should avoid temperature extremes, wetness/humidity, exposure to fumes, gases or poor ventilation, and working at exposed heights. (Tr. 16). Next, the ALJ determined that Plaintiff could return to her Past Relevant Work ("hereafter "PRW") as a cashier as that job is generally performed in the national economy, and that in the alternative, Plaintiff could perform sedentary jobs of callout operator and surveillance system monitor, and that there are such jobs existing in significant numbers in the national economy. (Tr. 21).

Plaintiff's relevant medical evidence of record is summarized as follows:

Plaintiff received treatment at the Franklin Primary Health Center ("Franklin") from March 2000 through April 2005. (Tr. 176-214, 288-307) . During this period, Plaintiff reported a number of symptoms including: cough, stuffy nose, post nasal discharge, tightness in breast area, sore throat, difficulty swallowing, night sweats, shortness of breath, inability to sleep, redness in right eye, nasal and sinus congestion, chest congestion and frontal headaches. (Tr. 176, 178, 179, 183, 185-186, 187, 195, 199, 201, 204, 206-207, 209-210, 290, 293, 296, 300, 302, 306). During her treatment at Franklin, Plaintiff was diagnosed with musculosketal

8

pain and fibroids, allergic rhinitis, questionable shortness of breath, fibroids, sinusitis and asthma exacerbated in part by smoking, conjunctivitis, bronchitis/asthma exacerbation and acute upper respiratory infection. (Tr. 177, 180, 184, 186, 188, 196, 198, 202, 203, 205, 289, 291, 294, 297, 301, 303, 307). Plaintiff was prescribed Albuterol inhaler, Flovent, a Z pack and Zyrtec. (Tr. 177, 184, 186, 188, 196, 207, 291, 296, 301, 303, 307). A chest X-ray in November 2002 showed no active chest disease. (Tr. 211, 295). Plaintiff's only visit to Franklin following her alleged onset date was an April 25, 2005 visit. At that time, Plaintiff complained of a stuffy nose and frontal headaches. She was diagnosed with asthma and allergic rhinitis. (Tr. 310- 311).

On February 2, 2003, Plaintiff presented to the USA Children's and Women's Hospital ("USA"), complaining that she could not breath. On examination, her bilateral breath sounds were clear to auscultation, with a faint end expiration wheeze in the right upper lobe and an expiration squeak in the left lower lobe. After treatment, Plaintiff reported increased air movement and decreased tightness. She was diagnosed with an upper respiratory infection and reactive airways disease. (Tr. 198).

Plaintiff was treated by Robert Lightfoot, M.D., at Victory Health Partners from April of 2003 to January of 2006. (Tr. 216- 260, 308-341, 350-359). A Medical and Personal History, completed on Plaintiff's initial visit on April 30, 2003, reflects that

Plaintiff reported a one year history of asthma, and that she smoked a pack of cigarettes per day until January of 2003, that she walked for exercise, and that she drank alcohol and used cocaine in the past. She reported that her current medications were Zantac, Albuterol and Provential. (Tr. 252-253). Plaintiff complained of abdominal pain, bloating and constipation, and reported a history of chronic constipation and reflux symptoms. Upon examination of Plaintiff, Dr. Lightfoot noted that Plaintiff was in no acute distress, that she had no respiratory distress and that she had normal breath sounds. His clinical impression was resolving acute gastroenteritis and he diagnosed her with chronic constipation, GERD and asthma. (Tr. 250-251).

Plaintiff next presented to Victory on August 14, 2003, complaining of shortness of breath. She reported that she had been using her metered dose inhaler with some relief, but that she was out of Flovent. Following a physical exam, Plaintiff was diagnosed with bilateral rales[5] and bilateral CBS, was prescribed Albuterol (noting improvement), and was referred to the pulmonary clinic. (Tr. 242-243).

On August 20, 2003 Victory provided Plaintiff with an Asthma Action Plan, which characterized her asthma as "moderate

---

[5]Rales is an abnormal lung sound heard through a stethoscope. www.medterms.com/script/main/art. (last visited July 31, 2008).

persistent", and included prescriptions for Albuterol, Flovent, and Serevent as needed. (Tr. 239). During this visit, Plaintiff reported that her asthma had not worsen since her last visit, that there was now a pet in her work place, that her symptoms worsen with heat and humidity, that her asthma had not caused her to miss work or school or reduce or change her activities, and that she had not missed any regular doses of her medications. She also indicated that she used her inhaler more than once a day, and that she sought treatment in a hospital or emergency room for asthma in May of 2003. She further stated that, in the past two weeks, she experienced a cough, wheezing, shortness of breath, and chest tightness during the day at work due to the presence of a dog, and that at night she slept with her head elevated. (Tr. 240).

During a respiratory therapy visit on August 20, 2003, Plaintiff reported a cough due to exposure to a dog, and that she was experiencing headaches, which she related to Advair, and wheezing at night. The notes reflect that Plaintiff's breath sounds were clear and equal, and that her condition had not changed since her last visit. (Tr. 241). A spirometry[6] conducted on this same day resulted in a FEV1 of 79% predicted and a lung age of 77. The

---

[6]A spirometry tests the air capacity of the lung. A machine (spirometer) is used to measure the volume of air inspired and expired by the lungs. www.medterms.com/script/main/art. (last visited July 31, 2008)

interpretation reflects "Normal Spirometry".   (Tr. 260).

Plaintiff was next seen at Victory on September 10, 2003.  She reported a recent increase in shortness of breath, nasal congestion, occasional wheezing, and non-productive cough.   Upon a physical examination, it was noted that Plaintiff had nasal congestion and sinus tenderness.  She had normal breath sounds, and her chest was non-tender. No respiratory distress was noted.  Plaintiff was diagnosed with asthma exacerbation, allergic rhinitis and GERD, and was referred to the pulmonary clinic.  (Tr. 237-238).

During a September 17, 2003 visit to Victory, Plaintiff reported that since her last visit, her symptoms were a lot worse than usual at night and when she was walking, and had caused her to miss work or school or reduce or change her activities.  She also reported that she experienced coughing, wheezing, shortness of breath, and chest tightness during the day, at night and while exercising.  (Tr. 234).  The respiratory therapist noted that Plaintiff's peak flow was 280, that her breath sounds were decreased, and that her diagnosis was "Asthma-chronic". She was continued on a treatment plan. (Tr. 236).   A spirometry conducted on this same day resulted in a FEV1 of 73% predicted and a lung age of 83. The interpretation reflects "Normal Spirometry." (Tr. 259).

During a respiratory therapy visit on October 8, 2003, Plaintiff reported that since her last visit, she had experienced

12

a productive cough with clear, thick sputum, wheezing and chest tightness, shortness of breath with any exertion, loss of sleep due to coughing and orthopnea, and that she had reduced her work hours as a result. She also reported feeling worst during the last week, and attributed it to the weather because her habits had not changed. (Tr. 233). A spirometry conducted on this same day resulted in a FEV1 of 49% predicted and a lung age of 106. The interpretation reflects "low vital capacity possibly due to restriction of lung volume." (Tr. 258).

During Plaintiff's October 22, 2003 visit to Victory, the therapist noted that Plaintiff's breath sounds were clear, and that her progress had improved since her last visit. Plaintiff reported hoarseness, but no coughing, wheezing, chest tightness, shortness of breath, or loss of sleep. (Tr. 231). Treatment notes from Plaintiff's respiratory therapy visit on November 12, 2003 reflect that Plaintiff's breath sounds were clear on auscultation. (Tr. 230). A spirometry conducted on this same day resulted in a FEV1 of 84% predicted and a lung age of 72. The interpretation reflects "Normal Spirometry." (Tr. 257).

During Plaintiff's November 26, 2003 visit to Victory, she reported sinus congestion and sinus pain for one week. Her associated symptoms were noted as sinus pain, nasal discharge, earache, and ear fullness. The treatment notes reflect that she was not experiencing any acute distress, and the physical examination

13

revealed conjuctival erythema on the right and left, timpatic membrane ("TM") erythema, mucosal edema and erythema.  She had normal breath sounds.  The clinical impression was acute sinusitis and upper respiratory infection.  (Tr. 227-228).  Notes from a respiratory therapy patient visit the same day reflect that Plaintiff complained of nasal congestion, and of dizziness and blurry vision that may have been associated with Advair.  (Tr. 229).

Plaintiff presented to Victory on December 4, 2003, complaining of congestion and a cough for one week that improved after starting medication.  Her symptoms were noted as congestion in nose and sinuses, sore throat, cough with sputum, and headache.  The treatment notes reflect no acute distress, no respiratory distress, normal breath sounds, and non-tender chest.  Purulent nasal drainage and pharyngeal erythema/exudate were noted.  Her diagnosis included acute sinusitis (improving) and asthma.  (Tr. 225-226).

Plaintiff's next visit to Victory was on December 30, 2003. She complained of a sore tongue, which she relayed to her use of Advair.  Her symptoms included nasal drainage.  Upon examination, it was noted that Plaintiff had no respiratory distress.  Normal breath sounds and a non-tender chest were also noted.  She was instructed to discontinue Advair and to use Flovent and Serevent. (Tr. 223-224).  Plaintiff had a follow-up visit on January 6, 2004. Her physical examination revealed rales/rhonchi, and her oxygen saturation was 95%.  Her diagnosis was asthma.  (Tr. 221-222).

14

During her January 21, 2004 visit to Victory, Plaintiff reported that since her last visit, she had experienced occasional coughing at night and wheezing, daily chest tightness, and shortness of breath with walking. She also reported that she had to sit up to sleep. (Tr. 220). Plaintiff's asthma was listed as "moderate persistent," and she was provided a treatment plan, which included Albuterol as needed. She was also directed to take Flovent and Serevent twice daily, and Singular for control when breathing was good with no cough or wheeze. She was also prescribed Prednizone if her symptoms worsen, and Albuterol and Prednisone if the symptoms continued to worsen. (Tr. 219).

During Plaintiff's March 3, 2004 visit to Victory respiratory therapy, she reported daily chest tightness, shortness of breath, and cough/sputum, especially at night; occasional loss of activities/school/work; and loss of sleep every night. (Tr. 218). A spirometry on this day resulted in a FEV1 of 63% predicted, and lung age of 81. The interpretation reflects "mild obstruction and low vital capacity possibly due to restriction." (Tr. 258). Plaintiff visited Victory on March 16, 2004, and reported a cough for one week, mostly at night, sore throat, hoarseness, cough with sputum, tight chest, mild pharyngeal erythema, bilateral serous TM exudates left and right, lymphadenopathy and wheezing. She was diagnosed with moderate, persistent asthma, improved on increased Flovent, GERD and cough. (Tr. 216-217).

15

Plaintiff returned to Victory on April 6, 2004 for a follow-up visit.   A Physical Examination revealed no respiratory distress, normal breath sounds, and cough.   (Tr. 335-336).   At a respiratory therapy visit on April 21, 2004.   Plaintiff reported daily chest tightness, shortness of breath, cough/sputum, and sleep loss every night.   (Tr. 334). Plaintiff was diagnosed with moderate persistent asthma.   A spirometry on this day resulted in a FEV1 of 69% predicted.   The interpretation reflects "mild obstruction."   (Tr. 339).

In a respiratory therapy visit on April 28, 2004, Plaintiff reported that her chest tightness and shortness of breath were much better, that her cough/sputum was better, and that she was able to sleep through the night.   Plaintiff had no wheezing, and her breath sounds were clear.   It was noted that Plaintiff had improved since her last visit, and that she was continued on medications. (Tr. 333).   In a respiratory therapy visit on June 2, 2004, Plaintiff's breath sounds were clear, and she reported no wheezing or chest tightness.   She indicated that she experienced shortness of breath upon exertion, and that she had sinus trouble.   She further reported that during the past week, she had used her nebulizer due to increased symptoms.   (Tr. 332).   There is also a notation of a hospital or ER visit; however, the treatment notes do not contain any information regarding the visit.

Plaintiff's next visit to Victory was on September 1, 2004.

16

She complained of a cough, sinus, sore throat and congestion.  A physical examination revealed mild pharyngeal erythema and nasal mucosal edema.  Her diagnosis was listed as stable asthma, allergic rhinisinusitis, and GERD.  (Tr. 330-331).  In a follow-up visit on September 27, 2004, Plaintiff reported that her symptoms had worsen as a result of allergen exposures, which she attributed to the storm.  According to Plaintiff, she experienced cough/sputum, some incontinence with severe coughing, and loss of sleep due to coughing.  She also reported that her symptoms interfered with her sleep and household activities.  A physical examination revealed that Plaintiff was alert, was in no acute distress, had mild pharyngeal erythema with exudate, and an lymphadenopathy on the right and left.  Her diagnosis was asthma, rhinopharyngitis, and improved GERD.  (Tr. 328-329).

Plaintiff's next visit to Victory was on October 20, 2004.  She reported a cough with clear sputum, stuffy head and itchy eyes.  A physical examination revealed pharyngeal erythema, anterior lymphadenopathy on the right and left and good aeration.  Her diagnosis was asthma, viral symptoms, and allergic rhinitis.  (Tr. 326-327).  Plaintiff visited Victory again on November 2, 2004.  She complained of shortness of breath and cough with yellow thick sputum for the past three to four weeks.  Her also reported chest discomfort, chest pain, sputum on coughing, subjective fever, sore throat, headache, stress incontinence, wheezing, rales, and rhonchi

with bronchial rattle.    A physical examination revealed moderate distress, pharyngeal erythema with dull TM, wheezing, rales, rhonchi, and bronchial rattle.    Her diagnosis was acute chronic asthma, acute bronchitis, and GERD.  (Tr. 324-325).

Plaintiff's next visit to Victory was on December 14, 2004. She reported coughing, which increased when she reclined, post nasal drip, sinus pressure, fever, and sore throat.    A physical examination revealed that Plaintiff was alert and in no acute distress. She had swollen and red inferior tuberatis, and pharyngeal erythema with streaks.  Her diagnosis was allergic rhinitis, asthma and GERD.  She was referred to the pulmonary clinic.  (Tr. 322-323).

Plaintiff visited Victory on December 20, 2004, complaining of runny nose, and nasal and sinus congestion.   She also reported sneezing, runny nose, scratchy throat, itchy and watery eyes, nasal congestion, sinus congestion, worsening of asthma, yellow copious sputum, greenish nasal congestion, fever, chills, fatigue, shortness of breath, nausea and headache.   A physical examination revealed moderate distress, purulent nasal drainage, pharyngeal erythema, decreased air movement, wheezing and rhonchi.   She was diagnosed with asthma, sinusitis, and GERD.   (Tr. 320-321).   During a respiratory therapy visit on December 29, 2004, Plaintiff reported wheezing one to two times a week, chest tightness two times a month, clear breath sounds, cough and sputum associated with nasal drops, and a hospitalization or ER visit in early November for wheezing,

18

at which she was treated with Albuterol.  (Tr. 319).

Plaintiff's next respiratory therapy visit was on March 9, 2005.  She reported wheezing daily, severe coughing daily, especially at night, nasal symptoms and congestion. (Tr. 315).  In a respiratory therapy visit on April 13, 2005, Plaintiff reported daily wheezing, chest tightness and shortness of breath, and severe daily cough, especially at night with clear sputum, daily cough with yellow to clear sputum, and loss of sleep in the past several days. She also complained of nasal symptoms, raspy sore throat and severe cough.  (Tr. 314).  During a visit to Victory on the same day, Plaintiff reported a sore throat, and cough with sputum.  She also reported fever, fatigue and nasal congestion.  A physical examination revealed no acute distress, pain on percussion over frontal and maxillary sinuses, serous effusion on left and right, mucosal edema, mouth ulceration, no respiratory distress, and bilateral decreased air movement.  She was diagnosed with asthma. (Tr. 312-313).

During a respiratory therapy visit on May 18, 2005, Plaintiff reported occasional wheezing with cough, chest tightness and shortness of breath, clear and equal breath sounds, daily cough, interference with activities, and frequent sleep.  Plaintiff also reported using her nebulizer two times a day or more. (Tr. 309). Plaintiff's next respiratory therapy visit was on June 15, 2005. Plaintiff reported daily and continuous wheezing, chest tightness

and shortness of breath all day, daily cough with clear yellow to clear sputum, loss of sleep every night, and loss of activities. (Tr. 308). A spirometry on the same day resulted in a FEV1 of 58% predicted, and the interpration reflects "moderate obstruction." (Tr. 337).

On August 10, 2005 and August 15, 2005, Dr. Lightfoot and respiratory therapist Mr. Optholt completed forms in which they opined that Plaintiff's chronic moderate asthma results in shortness of breath, causing "extensive diminution of individual's capacity to carry out specific activities of daily living and requiring frequent use of medication and/or nebulizer." They further opined that physical activity moderately "increases shortness of breath and/or fatigue to such an extent as to cause the individual to regularly stop and rest, work at a slow pace, and/or be unable to work a full 8 hour day." They opined that medication and/or use of the nebulizer moderately impacts her work ability such that limitations are present which may limit her effectiveness due to distraction, inattention, drowsiness, such as to require some work accommodation by the employer. (Tr. 340-341).

Plaintiff returned to Victory for treatment on August 17, 2005. She reported nasal congestion, but no respiratory difficult. She also reported that she had experienced blurred vision for a few hours on one day, and that her Allegra and Nasacort helped. A physical examination revealed that Plaintiff was alert and in no

20

respiratory distress.   She had no sinus tenderness, normal breath
sounds, and non-tender chest.   TM serous effusions was also noted.
Plaintiff was diagnosed with asthma, allergic rhinitis, GERD, and
uterine bleeding.   Plaintiff was continued on her medication, and
directed to take Allegra daily.   (Tr. 358-359).

Plaintiff next sought treatment at Victory on September 16,
2005.   She reported cough with sputum, chills and sinus pain for
several days, chest and back pain, wheezing, dyspnea, nasal drainage
and left earache.   A physical examination revealed that Plaintiff
was alert, and in no acute or respiratory distress.   Her breath
sounds were normal.   Left TM redness and mucosal edema were noted.
Plaintiff was diagnosed with acute sinusitis and acute bronchitis.
(Tr. 356-357).

Plaintiff's next visit to Victory was on October 11, 2005.   She
reported coughing and wheezing, fever for three days, chills,
fatigue, congestion, watery eyes, and diarrhea.   A physical
examination revealed that she was alert and in no acute or
respiratory distress.   Her breath sounds were normal.   Serous
effusion was noted in her ears.   She was diagnosed with asthmatic
bronchitis.   (Tr. 354-355).   Plaintiff returned to Victory on
October 20, 2005, and reported that she had not gotten better since
her last visit, and that she had gone to the Emergency Room the
night before; however, she left after waiting for two hours.
Plaintiff also reported that she had felt "tight" for 4 days, and

that she had noticed an increase in her difficulty breathing, which it appears she related to "chocolate + other foods" she ingested. Plaintiff further reported that her tongue had turned red from the steroid inhaler, and that she had experienced diarrhea and a "milky sputum". She  denied any tobacco use, and indicated that she "is exposed to 2nd hand smoke" at her "job". A physical examination revealed that Plaintiff's tongue appeared to be normal in color, and that she had some wheezing and rhonci. She was continued on her medication, and it was noted that an "elimination diet" would be tried. (Tr. 352-353). Plaintiff had a follow-up visit at Victory on January 17, 2006. She reported fever, cough with clear sputum, trouble breathing, and increased nebulizer use. A physical examination revealed that Plaintiff was alert, and in no acute or respiratory distress. Plaintiff's chest was non-tender and her breathing sounds were normal, but mild wheezing was noted. Plaintiff was diagnosed with "asthma- severe persistent" and menorrhagia-h/o uterine fibroid. (Tr. 350-351).

Plaintiff underwent a consultative evaluation by Travis Rutland, M.D. on November 12, 2005. Dr. Rutland noted that Plaintiff presented "an abundant amount of medical records" and copies of her pulmonary function tests dated June 15, 2005 and April 21, 2004, showing mild airflow obstruction and showing moderate air flow obstruction, for his review. On physical examination, Dr. Rutland noted that chest/lungs were clear to auscultation

bilaterally anteriorly and posteriorly, and that no crackles, wheezing, or rhonchi were auscultated. He also noted that Plaintiff had a mildly prolonged expiratory phase during the respiratory cycle. He diagnosed Plaintiff with mild to moderate asthma, and based on the objective data from his examination, opined that Plaintiff should be able to stand and walk for two hours during an eight-hour workday, sit unrestricted, and lift 20 pounds occasionally and 10 pounds frequently. He further opined that Plaintiff should have no environmental exposure to dust or allergens. (Tr. 342-346).

On November 14, 2005 Dr. Rutland completed a Medical Source Opinion in which he opined that Plaintiff can stand/walk for two hours at a time, and four hours total in an eight-hour workday, lift 10 pounds constantly, 20 pounds frequently, and 25 pounds occasionally, climb occasionally, never be exposed to fumes, noxious odors, dust, mists, gases or poor ventilation, occasionally be exposed to extreme cold or heat or humidity, and occasionally work in high places. He noted that his evaluation was based on both subjective and objective data. (Tr. 348-349).

**A. Whether the ALJ erred in failing to consider the severity of the Plaintiff's non-exertional impairment in finding that she could perform her past relevant work as a cashier and in failing to give appropriate consideration to the medical source statement of the treating physician as required under SSR 96-2P, SSR 96-5P, and SSR 96-7P.**

Plaintiff argues that the ALJ erred in discounting her

23

credibility with respect to the severity of her impairments, by
rejecting the opinions of Dr. Lightfoot, her treating physician,
and Mr. Optholt, her respiratory therapist, by finding that she
could return to her past relevant work, by erroneously
characterizing the job of cashier as "both unskilled and semi-
skilled" at the light exertional level, and by rejecting the
testimony of the Vocational Expert.

In discrediting Plaintiff's allegations of limited
functionality, the ALJ stated the following:

> The claimant's credibility is diminished by
> inconsistencies between her sworn testimony at the
> hearing held in January 2006 and references within the
> medical record that she was working after her alleged
> disability onset date.  See Exhibit 12F at 3.  The
> claimant's credibility is further diminished by differing
> alleged disability onset dates as well as her poor work
> record.  See Exhibits 2D, 4D, 5D.  In an application
> filed less than one year prior to her current
> application, the claimant alleged that she became
> disabled in June 1995.  Only eight months later, the
> claimant changed her allegations to a December 2003
> onset.  The evidence shows that the claimant was born in
> July 1960 and for the 25 years following her 21st
> birthday the claimant has not earned even a total of
> $15,000, indicating a relatively non-existent interest in
> working.

(Tr. 17).[7]   Social Security Ruling 96-7p *Policy Interpretation
Ruling—Titles II and XVI: Evaluation of Symptoms in Disability
Claims: Assessing the Credibility of an Individual's Statements*

---

[7]While the ALJ concluded that Plaintiff's low earnings are a
reflection of a"non-existent interest in working," this was not
the only reason relied upon by the ALJ for discrediting
Plaintiff's assertions regarding the degree of her limitations.

24

("SSR 96-7p") sets forth the method by which an ALJ may discredit a Plaintiff's statement:

> [T]he adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.

SSR 96-7p also sets forth seven factors to be considered when additional information is needed to assess a Plaintiff's credibility.[8]  Plaintiff argues that the ALJ did not specifically discussing the seven factors set forth in SSR 96-7p in assessing Plaintiff's credibility.  While it is true that the ALJ did not expressly reference each of the seven factors set forth in SSR 96-7p, a review of his decision reflects that he considered the entire record, including Plaintiff's statements regarding her alleged

---

[8]The seven factors are as follows:  1.  The individual's daily activities; 2.  The location, duration, frequency, and intensity of the individual's pain or other symptoms; 3.  Factors that precipitate and aggravate the symptoms; 4.  The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5.  Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, os sleeping on a board); and 7.  Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

limitations, in reaching his decision. <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1211 (llth Cir. 2005)("while the ALJ is required to articulate explicit and adequate reasons for questioning an applicant's credibility, the ALJ need not specifically refer to every piece of evidence in his decision.) The ALJ pointed to inconsistencies between Plaintiff's testimony and the medical records in concluding that Plaintiff's impairments could reasonably be expected to produce some symptoms, but not to the degree alleged by Plaintiff.  The ALJ noted that in Plaintiff's first application, she alleged an onset date of June 1995, and that eight (8) months after the denial of her first application, Plaintiff filed a second application alleging an onset date of December 2003.  Additionally, Plaintiff testified that she stopped working in October 2003; however, she reported to medical personnel in October 2005 that she was exposed to second-hand smoke at work.  It is also noteworthy that while Plaintiff, on occasion, told her medical care providers that her symptoms interfered with her daily activities, there is no indication in the medical records that Plaintiff provided any specifics regarding the degree of the limitations that she experienced.  Moreover, absent the conclusory statements contained in the assessments completed by Plaintiff's treating physician and therapist in August 2005, the treatment records of devoid of any restrictions placed on Plaintiff's activities by either her treating physician or therapist.  Accordingly, the undersigned finds that the ALJ did not

err in discrediting Plaintiff's testimony regarding the degree of
her limitations.

Plaintiff further argues that the ALJ failed to give
appropriate consideration to the opinion of Dr. Lightfoot, her
treating physician. Substantial weight must be given to the
opinion, diagnosis and medical evidence of a treating physician,
unless there is good cause to do otherwise. See, e.g., Lewis v.
Callahan, 125 F.3d 1436, 1439-1441 (11th Cir. 1997); Edwards v.
Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Sabo v. Commissioner
of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); and
20 C.F.R. § 404.1527(d). See also Johnson v. Barnhart, 2005 WL
1414406, *2 (11th Cir. Jun. 17, 2005); Wind v. Barnhart, 2005
1317040, *6 (11th Cir. Jun. 2, 2005) (citing to Crawford v. Comm'r
of Social Security, 363 F.3d 1155, 1159 (11th Cir. 2004)). Such
"good cause" exists where: 1) the opinion was not bolstered by the
evidence; 2) the evidence supported a contrary finding; or 3)
opinion was conclusory or inconsistent with the doctor's own medical
records. Johnson, 2005 WL 1414406, *2; Wind, 2005 1317040, *6.
"The ALJ must clearly articulate the reasons for giving less weight
to the opinion of a treating physician, and the failure to do so is
reversible error[;]" likewise, he commits error if he substitutes
his own uninformed medical evaluations for those of a claimant's
treating physicians absent good cause. (Id.) And it is the ALJ's
duty, as finder of fact, to choose between conflicting evidence and

he may reject the opinion of any physician when the evidence
supports a finding to the contrary.  Id. (citing to Landry v.
Heckler, 782 F.2d 1551, 1554 (11th Cir. 1986) and Bloodsworth, 703
F.2d at 1240).[9]

In discounting the assessment of Dr. Lightfoot, the ALJ states
as follows:

> [O]bjective evidence, including physical examinations,
> spirometry test results, and chest x-ray . . . do not
> document chronic obstructive pulmonary disease with an
> FEV 1 equal to or less than 1.25 for the claimant's
> height.  The evidence documents that the claimant's
> baseline FEV 1 values were substantially higher than 1.25
> even when she complained of increased symptoms.
> Moreover, the evidence does not show that the claimant
> experienced asthma attacks that required even occasional
> intensive physician intervention or in-patient
> hospitalization for longer than 24 hours for control of
> asthma....
>
> More weight is assigned to the opinion of Dr.
> Rutland than those of Dr. Lightfoot and Mr. Optholt
> because the objective evidence does not support he
> finding that the claimant experiences limitations to the
> degree implied in the asthma assessments by Dr. Lightfoot
> and Mr. Optholt.  There is no evidence that the
> prescribed medications cause distraction, inattention or
> drowsiness to such an extent that work accommodation by
> an employer would be required.  The claimant reported
> that her condition caused no limitation on her ability to

---

[9]See also Blake v. Massanari, 2001 WL 530697, *10 n.4 (S.D.
Ala. Apr. 26, 2001); 20 C.F.R. § 404.1527(d)(2).  The Eleventh
Circuit has repeatedly made clear that the opinion of a treating
physician must be given substantial weight unless good cause is
shown for its rejection.  See, e.g., Lamb v. Bowen, 847 F.2d at
703; Walker v. Bowen, 826 F.2d 996, 1000 (11th Cir. 1987);
Sharfarz v. Bowen, 825 F.2d at 279-80; Schnorr v. Bowen, 816 F.2d
578, 581 (11th Cir. 1987); McSwain v. Bowen, 814 F.2d 617, 619
(11th Cir. 1987); MacGregor v. Bowen, 786 F.2d at 1053; Wilson v.
Heckler, 734 F.2d 513, 518 (11th Cir. 1984); and 20 C.F.R. §
404.1527(d)(2).

drive an automobile and that function certainly requires one to be attentive and alert.  Moreover, there is no indication that Dr. Lightfoot ever told the claimant that she should stop driving an automobile because of medication side effects.  Dr. Lightfoot's notes do not indicate that the claimant complained of such medication side effects....

Another reason for assigning more weight to the opinion of Dr. Rutland than to that of Dr. Lightfoot is that Dr. Rutland made it clear that his opinion was based on objective evidence as well as the claimant's subjective complaints and that he had the claimant's medical records for review.  Although the asthma assessment form had an area for comments, Dr. Lightfoot provided no basis for his opinion.

(Tr. 18-20).

Based upon a review of the record, the undersigned finds that substantial evidence supports the ALJ's decision to assign little weight to the opinions of Dr. Lightfoot and Mr. Optholt, which were expressed in the assessments dated August 10, 2005 and August 15, 2005.  As a preliminary matter, the undersigned notes that the ALJ did not reject the treatment records of Dr. Lightfoot and Mr. Optholt.  His decision reflects that not only did he discuss their treatment records, he relied upon the records in reaching his decision.  Moreover, while the ALJ referenced the fact that Plaintiff did not meet the listing for asthma in rejecting the opinions contained in the assessments, that was not the only basis for rejecting the opinions.  As noted supra, the ALJ found that the objective medical evidence did not support the limitations provided in the assessments.

29

A review of the medical records reflect that in 2003, the year prior to Plaintiff's alleged onset date of December 31, 2003, Plaintiff sought medical treatment for asthma-related symptoms at least 15 times; in 2004, she sought treatment at least 15 times; and in 2005, she sought treatment at least 10 times. (Tr. 176-177, 198, 215, 216-218, 220-231, 233-234, 236, 237-238, 241-243, 308-310, 312-317, 319-336, 352-359). The treatment records reveal that while Plaintiff had long standing asthma, which was described as "severe, persistent", and two pulmonary tests that reflect "mild" and "moderate" obstruction, her condition was generally under control with medication. Her physical examinations on occasion evidenced rales, mild wheezing, and pharyngeal erythema; however, most of the exams revealed that she had normal breath sounds, no acute or respiratory distress, non-tender chest and no wheezing.

Additionally, the medical records reflect only three occasions in which Plaintiff reported any problems with her medications, namely August 20, 2003, November 26, 2003, and December 2003. (Tr. 229, 259, 260). The August 20, 2003, November 26, 2003 dates predate Plaintiff's alleged onset date. During the August 20, 2003 visit, Plaintiff indicated that her medication caused headaches; however, it does not appear that her report necessitated a change in her medication. (Tr. 240). The record instead reflects that Plaintiff expressed concern about the *cost* of "Proventil" and as a result, she was switched to "generic

albuterol".  The undersigned finds it noteworthy that Plaintiff's treatment plan which bears the same "August 20, 2003" date indicates that "*10-30 minutes before sports or other strenuous activity, use this medicine: Albuterol MDI 2 puffs" (Tr. 239). This is significant because it does not direct Plaintiff to avoid strenuous activity, but instead directs her to use the "Albutersol MDI 2 puffs" 10 -30 minutes before beginning such activities. (Id.)

The November 26, 2003 treatment note reflects that Plaintiff complained of dizziness and blurry vision, and that medical personnel noted that the symptoms might be associated with Plaintiff's "Advair dose"; however, the records do not reflect that Plaintiff reported any change in her activities necessitated as a result, or that her medication was changed.  (Tr. 229).   In December 2003, Plaintiff reported that Advair made her tongue sore; thus, she was switched to Florent. (Tr. 223-224).  In August 2005, Plaintiff reported blurred vision;  however, she did not attribute it to her medications.  In fact, Plaintiff instead indicated that Allegra and Nascocort helped. (Tr. 358-359).

As observed by the ALJ, while Dr. Lightfoot's final treatment note, dated January 2006, describes Plaintiff's asthma as "longstanding," "severe, persistent," his physical examination of Plaintiff revealed that she was alert and in no acute distress. While she reported a cough, and demonstrated mild wheezing, her chest was nontender, and her breath sounds were normal.    The

31

totality of the treatment records reflect that Plaintiff's asthma was under control and being managed with medications, which did not cause any notable side-effects.   In view of such substantial evidence, the undersigned finds that the ALJ did not err in finding that the opinions expressed in the assessments of Dr. Lightfoot and Mr. Optholt were entitled to little weight as they were not supported by the objective medical evidence.

Plaintiff next alleges that the ALJ erred in discrediting that portion of Dr. Rutland's report wherein he concluded that Plaintiff could only stand/walk four hours total in an eight-hour workday, and by not accepting the vocational testimony that Plaintiff cannot perform any work in significant numbers in the national economy. The undersigned finds that assuming arguendo that the ALJ erred in rejecting Dr. Rutland's opinion that Plaintiff was limited to standing/walking four hours total in an eight-hour workday, the error was harmless.   During the administrative hearing, the Vocational Expert testified that if a hypothetical individual of Plaintiff's vocational background were limited to the extent expressed by Dr. Rutland, such a person would be limited to a full range of sedentary work activity and that there were jobs existing in the national economy that such a hypothetical could perform. (Tr. 383-384).   According to the Vocational Expert, such an individual could perform a call out operator job, which is unskilled and has 48,000 positions in existence in the national

economy, and a surveillance systems monitor, which is also unskilled, and has 142,900 positions in existence in the national economy. In his decision, the ALJ determined that Plaintiff could return to her past relevant work as a cashier. (Tr. 20). In the alternative, he concluded that Plaintiff could perform the two positions identified by the Vocational Expert, and that such positions exist in significant numbers in the national economy. Given the ALJ's alternative holding, which was based on Dr. Rutland's opinion that Plaintiff was limited to four hours of standing/walking in a total eight-hour work day, and the Vocational Expert's testimony that Plaintiff could perform the surveillance systems monitor and call out operator positions, and that both positions exist in significant numbers in the national economy, the undersigned finds Plaintiff's argument to be without merit. The ALJ's alternative holding is supported by substantial evidence.

## V. Conclusion

For the reasons set forth, and upon careful consideration of the administrative record and memoranda of the parties, it is **ORDERED** that the decision of the Commissioner of Social Security, denying Plaintiff's claim for supplemental security income, is due to be **AFFIRMED.**

**DONE** this **18th** day of **August, 2008.**

                    _____/s/ SONJA F. BIVINS_____
                    **UNITED STATES MAGISTRATE JUDGE**

33